IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| STACEY SCROGGINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO.  2:13CV63-CSC |
| | ) | (WO) |
| TROY UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The Plaintiff, Stacey Scroggins, filed this action against her former employer,  Troy University, alleging that she was subjected to discrimination and unequal pay on the basis of gender in violation of  Title VII of the Civil Rights act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Equal Pay Act, 29 U.S.C. § 206(d)(1).  Before the court is Troy University's motion for summary judgment. (Doc. 12). Having considered the motion for summary judgment (Doc. 12), the court concludes that it is due to be granted in part and denied in part.

**I.  Standard of Review**

"Summary judgment is appropriate 'if the   pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute[1]] as to any material fact and that the moving party is entitled to judgment

---

[1] Effective December 1, 2010, the language of Rule 56(a) was amended. The word "dispute" replaced the word "issue" to "better reflect [ ] the focus of a summary-judgment determination." Fed. R. Civ. P. 56(a), Advisory Committee Notes, 2010 Amendments.

as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–324.

Once the movant meets his evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Celotex*, 477 U.S. at 324; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also* Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

2

interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

To survive the movant's properly supported motion for summary judgment, a party is required to produce "sufficient [favorable] evidence" "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id.* at 249–250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576–1577 (11th Cir. 1990) (quoting *Anderson*, *supra*). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Hence, when a nonmoving party fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of Dep't of Children & Family Servs.,* 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co, Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323–324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine

4

dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).   However, if there is a conflict in the evidence, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Ruiz de Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000).

## II. Facts[2]

Scroggins is a licensed attorney who holds a Juris Doctorate degree, a Masters of Science in Human Resources, a Bachelor of Arts In Behavioral Science and Law, and a Professional Human Resources certification.   (Doc 15-26).   In 2003, Scroggins was employed as a non-tenure track lecturer at Troy University's global campus site at Fort Benning, Georgia, and, in 2006, was transferred to Elizabethtown, Kentucky, to assist in the opening of a new Troy University global campus site there.   (Doc.  15-2 p. 3-4, 8, Doc 15-26).   She continued to work as a non-tenured track lecturer at the Kentucky site until 2011.   As a non-tenure track lecturer, she taught graduate, undergraduate, and continuing education

---

[2]At this stage of the proceedings, this court takes the facts alleged by the non-movant as true and construes them in the light most favorable to the non-moving party. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) (citations omitted) ("In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party' and 'resolve all reasonable doubts about the facts in favor of the nonmovant.'   Moreover, the court must avoid weighing conflicting evidence or making credibility determinations.   Instead, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'").   Thus, the facts set forth herein are drafted relying on the undisputed facts and construing the facts in the light most favorable to the non-moving party.

classes in employment law, business, criminal procedure, and constitutional law; developed course materials; mentored new faculty; and served as faculty advisor to the Society of Human Resources Management. (Doc. 15-26). Scroggins was also required to serve as a faculty advisor to students, assist new students with orientation, maintain 15 office hours per week, participate in recruiting activities, and develop scholarly research and work. (Doc. 15-27).

Scroggins's work as a non-tenure track lecturer was performed pursuant to yearly contracts. In June 2010, Scroggins signed a contract to work as a non-tenure track lecturer for twelve months beginning August 1, 2010 at the annual salary of $44,269.71. (Doc. 13-5 p. 1) In April 2011, Scroggins signed a contract to work as a non-tenure track lecturer for twelve months beginning August 1, 2011 at the annual salary of $45,155.10. (Doc. 13-6 p.1).

In April 2010, Scroggins sent an email to Dr. David White, Southeast Region Director of Troy's Global Campus, informing him that she was aware of a newly-hired lecturer whose salary was $17,000 higher than her own. (Doc. 15-10 p. 1). Scroggins stated that she found the disparity in pay "extremely distressing." (Doc. 15-1 p. 1). Dr. White responded that new lecturers hired at higher salary rates than Scroggins's held earned doctorates, and that salary increases were not likely to occur in the near future due to budgetary concerns. (Doc. 15-10 p. 1). Dr. White informed Scroggins that she needed to perform her duties according to her contract or look for employment elsewhere. (Doc. 15-10 p. 1).

On August 30, 2011, Scroggins sent an email to Troy's human resources department

complaining that she knew of new lecturers being hired at a starting salary of $60,000, while her salary was only $44,269 for the previous year.  (Doc. 15-24).  In the email, Scroggins specifically stated that she felt that the disparity in pay was a violation of the Equal Pay Act and was discriminatory on the basis of gender.  (Doc. 15-24).

On September 6, 2011, Dr. Toni Taylor, Senior Human Resources Director for Troy University, responded to Scroggins's email to the human resources department.  Dr. Taylor stated that she had reviewed Scroggins's concerns and had found that no new lecturers had been hired at Troy University's global campus at a salary equal to or above $60,000.  (Doc. 15-24).  Dr. Taylor also stated that some of the male comparators Scroggins had listed (including Tom Collins) were tenure-track faculty members and, therefore, not suitable comparators, and that Troy University had no record of another comparator, Dominique Mineado (sic).  (Doc. 15-24).

On September 6, 2011, Scroggins sent an email informing Dr. Taylor that a Dominique Minadeo did work for Troy, and that Tom Collins was no longer a tenure-track lecturer, but a non-tenure track lecturer living in Iowa.  (Doc. 15-24).  Scroggins further stated, "Troy is in violation of federal law.  I will be pursuing my legal claims."  (Doc. 15-24).

On September 19, 2011, Scroggins signed a contract to teach two classes as an adjunct professor for the term ending October 18, 2011, for which she was to receive $4250.  (Doc. 13-7).

On September 26, 2011, Scroggins informed her supervisor, Dr. Bill Heisler, that she planned to accept an offer of employment to work elsewhere because of her concerns about gender discrepancy in pay, but Scroggins stated that she wished to continue teaching as an adjunct professor for an additional two years so that she could continue to contribute to her retirement plan. (Doc. 15-16 p. 2). Scroggins informed Dr. Heisler that she would have to file suit to obtain recourse for her allegedly discriminatory salary, and that she "sent [her] information to a lawyer in Montgomery for consideration of such an event." (Doc. 15-16).

On September 27, 2011, Dr. Heisler spoke with Associate Dean Dr. Scott Bailey about the concerns Scroggins had expressed in her email the previous day, and Dr. Bailey "indicated that he doubted" Troy University would adjust Scroggins's pay. (Doc. 15-16).

On October 5, 2011, Kim Barron, whose job is to schedule classes for Troy University, informed Scroggins that one of her three assigned courses would be reassigned to another instructor, but that she was still scheduled to co-teach two courses. (Doc. 15-19 p. 2). Barron stated: "[y]ou will be able to continue to teach for us in your adjunct capacity." (Doc. 15-19 p. 2).

When Scroggins asked Dr. Heisler for an explanation of the reassignment, Dr. Heisler informed her that the reassignment was in preparation for her anticipated resignation as a full-time lecturer at the end of term with the understanding that she would become an adjunct instructor; according to Dr. Heisler, three courses would exceed the maximum course load allowed for adjunct professors. (Doc. 15-19 p. 1).

On October 10, 2011, Scroggins submitted her resignation from her lecturer position effective October 18, 2011. (Doc. 15-37). In her resignation letter, she did not state that she was resigning to transition to an adjunct position; as the reason for her resignation, she stated that, "[a]fter eight years of teaching for Troy, I am frustrated by my inability to advance my career." (Doc. 15-37). On October 11, 2011, Dr. Bill Heisler forwarded Scroggins's resignation letter to Dr. Scott Bailey with a request that the letter be forwarded to Troy's human resources department, and also with the following request: "[P]lease let [the human resources department] know that [Scroggins] will be teaching in Term 2 as an adjunct. I have coordinated this with Kim Barron. If there is something else that Stacey needs to convert to adjunct status, please let me know." (Doc. 15-37).

On Monday, October 24, 2011, Dr. Bill Hiesler asked Dr. Scott Bailey why he was opposed to Scroggins continuing to teach as an adjunct. (Doc. 15-21). Dr. Bailey responded:

> I have known her from back when we were both at F[ort] Benning. She is competent, most times, but her bizarre actions and moods make her a higher maintenance asset than I think we need. I thought her 0-week notice that progressed to a 2-week notice was far from professional. I don't see the need to reward that.

(Doc. 15-21).

On November 1, 2011, Scroggins signed a contract to teach two courses as an adjunct professor for the term ending December 19, 2011, for which she was to receive $4200. (Doc. 13-8).

On September 8, 2011, Troy University sent emails to Scroggins inquiring about her

9

availability to teach two online classes as an adjunct professor for the term beginning January 9, 2012 and ending March 11, 2012.  (Doc. 15-38, 15-39).  Those emails specifically stated: "Your availability does not guarantee that eTROY will use you to teach this class. It is used for planning purposes only. If possible, you will be contacted prior to the beginning of the term if employment in this position is cancelled."  (Doc. 15-38, 15-39).  In December 2011, when she was unable to access the online website for the courses, Scroggins discovered that those classes had been assigned to other instructors.  (Doc. 15-22; Doc. 15-20 p. 5).  When she inquired about the matter, she was informed that Dr. Scott Bailey made the decision not to assign the classes to her.  (Doc. 15-22).  Thereafter, Scroggins was not offered any contract to teach as an adjunct.

### III. Discussion

On January 30, 2013, Scroggins filed a complaint alleging that her salary at Troy University resulted from gender discrimination in violation of Title VII of the Civil Rights act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), and the Equal Pay Act, 29 U.S.C. § 206(d)(1).  Scroggins also alleges that, due to gender discrimination in violation of Title VII, she was required to do work that similarly-situated male lecturers were not required to do.  Scroggins further alleges that she was subjected to retaliation in violation of Title VII and the Equal Pay Act when she was forced to work at the same location as another employee who made her feel threatened, and when her services as an adjunct professor were terminated.  In addition, Scroggins alleges that Troy University breached an employment

10

contract when it terminated her services as an adjunct professor.

**A.      Equal Pay Act**

**1.      Statute of Limitations**

Troy University argues that the statute of limitations has run on Scroggins's claim for disparate pay under the Equal Pay Act ("EPA") because Scroggins first suspected that she was paid less than similarly situated males in April 2010, more than two years before the filing of this lawsuit.  (Doc. 13 pp. 6-9).  Under 29 U.S.C. § 255(a), the statute of limitations for filing an EPA claim is two years, or three years in the case of a wilful violation. However, under the well-established law of this circuit, "[t]he theory of continuing violations has been applied consistently to actions under the Equal Pay Act."  *Mitchell v. Jefferson County Bd. of Educ.*,  936 F.2d 539, 548 (11th Cir. 1991).  "'Sex based, discriminatory wage payments constitute a continuing violation of the Equal Pay Act.'" *Id*. (quoting *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1050 (5th Cir.1973).  "Where a continuing violation is found, the plaintiffs can recover for any violations for which the statute of limitations has not expired." *Knight v. Columbus, Ga.*,  19 F.3d 579, 581 (1th Cir. 1994).  Scroggins continued to teach as a lecturer and receive paychecks from Troy University for that work until October 2011, less than two years before the filing of this lawsuit.  Therefore, the statute of limitations does not entitle Troy University to dismissal of Scroggins's EPA claim for wage discrimination.

2.      **The Alleged Equal Pay Act Violation**

To establish a *prima facie* case of discrimination under the Equal Pay Act, the plaintiff must show that her "employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 801 (11th Cir. 1992) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (quoting in turn 29 U.S.C. § 206(d)(1)). "Notably, because the *prima facie* case does not require a showing of an employer's discriminatory intent, the Act provides 'a form of strict liability.'" *Edwards v. Fulton County, Ga.*, 509 Fed. Appx. 882, 885 (11th Cir. 2013) (quoting *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992)). "Whether [an] employee of the opposite sex—typically called a comparator—performs equal work in an equal position depends on the 'primary duties of each job,' and the inquiry emphasizes 'actual job content' over formal job titles or descriptions." *Id.* at 886 (quoting *Arrington v. Cobb Cnty.*, 139 F.3d 865, 876 (11th Cir.1998). "The plaintiff need not prove that the job held by her . . . comparator is identical to hers; she must demonstrate only that the skill, effort and responsibility required in the performance of the jobs are 'substantially equal.'" *Miranda*, 975 F.2d at 1533. "Because at this stage the jobs and not the employees are compared, only the skills and qualifications actually needed to perform the job are considered," and "the skills and qualifications of the individual employees holding those jobs" are not considered. *Id.*

If the plaintiff estabishes a *prima facie* case under the EPA, the employer will nevertheless be absolved of liability if it shows, by a preponderance of the evidence, that the disparate salaries are caused by a "seniority system," a "merit system," a production-quota system, or "any factor other than sex." 29 U.S.C. § 206(d)(1);  *Edwards*, 509 Fed. Appx. at 885; *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994).  Thus, "[f]actors such as [the comparator's relative] experience and education operate as a defense to liability rather than as part of a plaintiff's *prima facie* case."  *Miranda*, 975 F.2d at 1533 n.8.  "The employer's burden of proof on these affirmative defenses is 'heavy,' because it 'must show that the factor of sex provided *no basis* for the wage differential." *Edwards*, 509 Fed. Appx. at 885 (quoting *Mulhall*, 19 F.3d at 590).  "If a defendant proves one of these affirmative defenses, the plaintiff's claim can survive a motion for summary judgment only if the plaintiff shows with affirmative evidence that the reason offered for the pay disparity was pretextual or was offered as a post-event justification."  *Id*. (citing *Schwartz v. Fla. Bd. of Regents*, 954 F.2d 620, 623 (11th Cir.1991)).

Scroggins alleges that she was paid less than the following male employees of Troy University: William Benton, Tom Collins, Cleophas Gaines, and Dominic Minadeo.[3] However,  based on the evidence submitted on summary judgment, it is undisputed that

---

[3]Scroggins also offers James Orndorff and James Stuckey as similarly-situated male comparators. However, it is undisputed that Orndorff and Stuckey were paid less than Scroggins.  (Doc. 15-1 p. 3). Therefore, Scroggins cannot establish an Equal Pay Act claim by using Orndorff and Stuckey as comparators. 29 U.S.C. § 206(d)(1) ("No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate *less* than the rate at which he pays wages to employees of the opposite sex."  (emphasis added)).

William Benton is not an appropriate comparator for Scroggins's EPA claim because Benton was a tenure-track assistant professor who was subject to research, publication, and other requirements that were not applicable to a non-tenured lecturer such as Scroggins. In her deposition, the Scroggins acknowledged that, as a lecturer, she did not expect "to be paid the same as someone who is hired into an assistant or an associate professor position." (Doc. 15-2 p. 12). *See* 29 U.S.C. § 206(d)(1) (prohibiting gender-based discrimination in pay for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions").

In May 2009, Tom Collins signed a contract to serve as a tenure-track assistant professor for ten months beginning August 1, 2009 in the Sorrell College of Business at the Troy University Campus; his salary was $75,000. (Doc. 13-19 p. 1). Collins is not an appropriate comparator for the period in which he served as a tenure-track assistant professor because Scroggins was a non-tenure track lecturer whose job did not require "equal skill, effort, and responsibility" as a tenure-track position. (Doc. 13-19 p. 12).

On June 4, 2010, Collins signed a contracts to serve as a non-tenured lecturer in law and accounting for Troy's western global campus site in San Antonio, Texas, for two months beginning on June 1, 2010, for which he to be paid $10,000.[4] (Doc. 13-19 p. 3). Also on

---

[4]On each contract signed by Collins, his address is listed as Dubuque, Iowa, and it is undisputed that he worked remotely from his home in Iowa by teaching online courses. Collins did not work from Troy University's global campus site in Kentucky where Scroggins worked. Troy University has not argued that Scroggins cannot establish an EPA claim because Collins or any other comparator not located at the Kentucky site did not work at the same "establishment" as she did; therefore, the court will not address this issue. *But see* 29 U.S.C.A. § 206(d)(1) (prohibiting employers from paying employees of one gender less than those of another gender at the same "establishment"); *Mulhall*, 19 F.3d at 591 ("'[E]stablishment' is

14

June 4, 2010, Collins signed a one-year contract to serve as a non-tenure track lecturer beginning August 1, 2010, for which he was to be paid $60,000. (Doc. 13-19 p. 2). On April 5, 2011, Collins signed a one-year contract to serve as a non-tenure track lecturer beginning August 1, 2011, for which he was to be paid $61,200. (Doc. 13-19 p. 2). By way of contrast, Scroggins's twelve-month salary for the period beginning August 1, 2010 was $44,269.71, and her twelve-month salary for the period beginning August 1, 2011 was $45,155.10. (Doc. 13-5 p. 1; Doc. 13-6 p.1).

Thomas Collins holds a masters degree in accounting and a Juris Doctorate. (Doc. 13-18). He is a certified public accountant. (Doc. 13-18). Prior to working at Troy University, Collins was a tenured professor and chair of the division of business administration at Loras College in Dubuque, Iowa, since 1988. (Doc. 13-18). In addition, he served as an adjunct professor at two other colleges beginning in 1999 and had been engaged in the private practice of law since 1998. (Doc. 13-18). In response to the EEOC's investigation into Scroggins's complaint, Dr. Toni Taylor, Senior Human Resources Director for Troy University, submitted a position statement in which she stated that Tom Collins was paid more than Stacey Scroggins because, upon hire, he had eleven years of experience as an attorney, had approximately 22 years of teaching experience, is a CPA, and had one publication and eight conference presentations. (Doc. 13-15 p. 3). In 2010, Scroggins had

---

defined by the Secretary of Labor as 'a distinct physical place of business rather than ... an entire business or 'enterprise' which may include several separate places of business.'" (quoting 29 C.F.R. § 1620.9(a) (1993)); 29 C.F.R. § 1620.9 (providing that, except in "unusual circumstances," "each physically separate place of business is ordinarily considered a separate establishment.").

seven years of teaching experience as a non-tenured and adjunct lecturer and two years of experience in a general practice law firm. (Doc. 15-26). Scroggins has no academic publications, but had several manuscripts in progress while she was employed at Troy University. (Doc. 15-26).

In her deposition, Dr. Taylor stated that Collins's "experience, prior to being hired at Troy, was significant and was considered" in setting his salary when he was appointed to the position of lecturer. (Doc. 15-3 p. 5). The record supports Dr. Taylor's representation that Collins's experience was "significant" in comparison with Scroggins, and there is no evidence Collins's salary as a non-tenured lecturer was based on some other factor, including gender.[5] Accordingly, the undisputed evidence demonstrates that Collins's salary as a non-tenure track lecturer was due to his relatively extensive prior academic, teaching, and legal experience, and was not the result of discrimination on the basis of gender in violation of the Equal Pay Act. 29 U.S.C. § 206(d)(1) (providing that an employer may pay different salaries

---

[5] Page two of Troy University's EEOC position statement contains the general statement that "[s]alary is based on various factors to include employee's contributions to the development of the program, grant writing, research, and publications to further the field of study, level of education, teaching experience, applied experience in the field, other credentials, and the market value of the discipline." In Dr. Taylor's deposition, she was asked whether the factors listed "toward the top of page two" of Troy University's position statement were considered in determining Collins's salary. Dr. Taylor answered, "I wasn't here or involved in his hiring. I don't know . . . . He was a tenure-track faculty member and was reassigned and changed positions [to become a lecturer] right after I got here." (Doc. 15-3 p. 4). Taking every inference in the plaintiff's favor, it is nevertheless clear from the context of Dr. Taylor's deposition that she was "sure" that Collins's experience was considered in setting his salary when appointing him to his lecturer position (Doc. 15-3 p. 5), and that she was not aware of the factors that were considered in setting his salary when he was initially appointed to the position of tenure-track assistant professor because that event occurred before she was employed at Troy University. (Doc. 15-3 p. 4). Because it is undisputed that Collins's position as a tenure-track assistant professor is not comparable to Scroggins's non-tenure track lecturer position, the factors Troy University used in setting Collins's tenure-track salary are irrelevant.

16

to employees performing equal work where the "differential [is] based on any other factor other than sex"); *Wu v. Thomas*, 847 F.2d 1480, 1485 (11th Cir. 1988) (holding that factors such as more extensive teaching and academic experience constituted a permissible "differential based on any factor other than sex" for purposes of an Equal Pay Act claim brought by a professor against the University of Alabama).

In May 2010, Cleophas Gaines, Jr., signed a contract to teach as a non-tenure track lecturer in the business department at Troy University's Montgomery, Alabama campus for a ten-month period beginning August 1, 2010, for which he was to receive $66,187.80. (Doc. 15-49 p.1).  In May 2011, Gaines signed a contract to teach as a non-tenure track lecturer in the business department at Troy University's Montgomery, Alabama, campus for a ten-month period beginning August 1, 2011, for which he was to receive $67,511.56. (Doc. 15-49 p. 2).

Scroggins argues that Gaines "performed the same or substantially the same work as [she did] , even though she had additional duties [he] did not have." (Doc. 15-1 p. 15).  The evidence Scroggins submitted and cited in support of this proposition demonstrates only that Gaines was a non-tenured lecturer at Troy University's Montgomery, Alabama, campus who was paid more than Scroggins. Scroggins has submitted no evidence demonstrating that Gaines's duties as a non-tenured lecturer were less extensive, more extensive, or equivalent to her own. (Doc. 15-30; Doc. 15-45)  For example, Scroggins submitted a Troy University document detailing the expectations of global campus faculty (Doc. 18-3); those expectations

17

would apply to Scroggins, but, since Gaines was not a global campus faculty member, there is no basis for concluding that the document has any relevance to Troy University's expectations of Gaines.  Further, Scroggins also submitted a position description which was specific to the position of "Lecturer, Elizabethtown Kentucky Site."  (Doc. 15-27).  This position description is applicable to Scroggins, but not to Gaines (who did not teach at the Elizabethtown site), and Scroggins has not submitted any evidence describing the work, skill, effort, and responsibilities required of Gaines in the position of lecturer at Troy's Montgomery, Alabama, campus.  The mere fact that Scroggins and Gaines both held the title of "non-tenured lecturer," one at a global campus facility in Kentucky and the other at an Alabama campus, is not sufficient to establish that Scroggins and Gaines performed "equal work" on jobs that required "equal skill, effort, and responsibility, and which [were] performed under similar working conditions," as is required to establish a claim under the Equal Pay Act.  29 U.S.C. § 206(d)(1); *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 592 (11th Cir. 1994) (holding that, for purposes of evaluating comparators for an EPA claim, "[j]ob titles are a factor for consideration, but are not dispositive"); *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1049 n.2 (5th Cir. 1973) (holding that "the controlling factor under the Equal Pay Act is not job description" or job titles, "but job content"); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

18

Moreover, the uncontradicted evidence supports Troy University's contention that Gaines was paid a higher salary than Scroggins because his experience and qualifications were more extensive than hers.  Both Scroggins and Gaines began teaching at Troy University in 2003, but Gaines holds a more advanced academic degree than Scroggins. (Doc. 18-4; Doc. 15-6).  In addition to a Juris Doctorate, Gaines holds the following degrees: an L.L.M. in Taxation from Georgetown University Law Center, a Masters of Professional Accountancy, and a Bachelor of Business Administration. (Doc. 18-4).  Scroggins does not hold an L.L.M.  (Doc. 15-6).  Further, the uncontradicted evidence establishes that Gaines's legal experience is significantly more extensive and specialized than Scroggins's.  (Doc. 18-4; Doc. 15-6).  Upon graduation from law school, Scroggins worked for only two years as an associate in a general practice and plaintiff's litigation firm in Sparta, Wisconsin, with an emphasis on employment and labor law.  (Doc. 15-26 pp. 1, 3).  Unlike Scroggins, Gaines has maintained an active law practice while teaching at Troy University.  (Doc. 18-4).  Since 2007, Gaines has been the owner and principal attorney of the Gaines Law Firm, LLC, with a focus on tax and estate planning, business planning, corporate mergers, and business litigation.  (Doc. 18-4).  Prior to 2007, Gaines worked as assistant legal counsel and assistant attorney general for the Alabama Department of Revenue.  (Doc. 18-4).  He has served as a temporary probate judge and as an administrative law judge for several Alabama agencies. (Doc. 18-4).   Accordingly,  the  uncontradicted  evidence  supports  Troy  University's contention that it paid Gaines more than Scroggins based on factors other than gender.  209

U.S.C. § 206 (providing that pay differentials "based on any factor other than sex" are permissible).

Dr. Dominic Minadeo holds a Ph.D. in the field of economics and is a non-tenured global campus lecturer who lives in Clarksville, Tennessee, and teaches online courses in economics in the business department of Troy University's Atlanta, Georgia global campus site. (Doc. 15-2 p. 22; Doc 15-20 p. 3; Doc. 15-46; Doc. 15-46 p. 3). Dr. Minadeo co-taught two classes with Scroggins (Doc. 15-3 pp. 21, 27). On April 1, 2010, Dr. Minadeo signed a contract to serve as a non-tenured lecturer in the business department for Troy University's southeastern global campus site in Atlanta, Georgia, for the period beginning August 1, 2010, for which he was to be paid $60,000. (Doc. 15-46 p. 3). On April 16, 2011, Dr. Minadeo signed a contract to serve as a non-tenured lecturer for Troy University's southeastern global campus site in Atlanta, Georgia, for the period beginning August 1, 2011, for which he was to be paid $61,200. (Doc. 13-19 p. 3). (Doc. 15-46 p. 2). Thus, Dr. Minadeo's salary was approximately $15,000 more Scroggins's during each of those two years. (Doc. 13-5 p. 1; Doc. 13-6 p.1). According to Troy University, Dr. Minadeo was paid more than Scroggins because a Ph.D. in economics has a higher market value than a Juris Doctorate within the University's business school program. (Doc. 15-20 p. 3; Doc. 15-25 p. 3). The record contains no evidence to the contrary. The only "evidence" that Scroggins cites to refute Troy University's position that a Ph.D. in economics had a higher market value than a Juris Doctorate is the fact that Dr. Minadeo made roughly the same salary as Collins, who did not

hold a Ph.D., an argument that makes little, if any, sense. Scroggins cites no authority for the proposition that Troy University must have exactly the same nondiscriminatory reason for paying two male professors a similar salary, and the court is aware of none. Scroggins also argues that a Juris Doctorate is the equivalent of a Ph.D. for purposes of academic faculty ranking at a university's business school, but argument is not evidence, and Scroggins has presented no evidence to support her argument that Troy should treat a Juris Doctorate as equivalent to an earned doctorate in economics. The court concludes that the undisputed evidence supports Troy University's stated nondiscriminatory reason for paying Dr. Minadeo a higher salary than Scroggins.

Accordingly, the undisputed evidence establishes that there are no-similarly-situated male comparators who were paid a higher salary than Scroggins because of their gender. Therefore, there is no genuine dispute of material fact, and Troy University is entitled to judgment as a matter of law on Scroggins's EPA claim of wage discrmination. *See Mulhall*, 19 F.3d at 590 (holding that, to prevail on an EPA claim, the plaintiff must establish the existence of similarly-situated comparators and that a defendant who demonstrates that any pay discrepancy was due to a differential other than gender cannot be liable under the EPA).

**B.    Title VII Wage Discrimination**

Scroggins alleges that Troy University paid her lower wages than male employees because she is a woman, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e, *et seq.*[6]   In a Title VII case, "[t]he plaintiff first has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 597 (11th Cir. 1994).  A *prima facie* case of disparate treatment in wages claim is established if the plaintiff demonstrates (1) she belongs to a protected class, (2) she received lower wages than similarly situated comparators outside of the class, and (3) she was qualified to do the job.  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Id*.  Once the plaintiff establishes a *prima facie* case, "[t]he burden then shifts to the defendant to 'articulate some legitimate nondiscriminatory reason' for the alleged discrimination. If the defendant produces such a reason, the plaintiff must then prove that the legitimate reason offered was a mere pretext for an illegal motive." *Mulhall*, 19 F.3d at 597 (quoting *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992).

The standard for establishing that a higher-paid employee is a similarly-situated comparator is more lenient under Title VII than under the Equal Pay Act.  *Mulhall v. Advance Sec., Inc.* 19 F.3d 586, 598-99.  (11th Cir. 1994). Therefore, the court will consider each of Scroggins's proferred comparators under the standards applicable to her Title VII claim.

---

[6]42 U.S.C.A. § 2000e–2(a)(1) provides: "It shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."

With respect to William Benton, it is undisputed that he is not a "similarly situated" comparator because he was a a tenure-track assistant professor and was subject to research, publication, and other employment requirements to which Scroggins was not required to adhere. (Doc. 15-2 p. 12). Scroggins has admitted that she had no expectation that she would be paid the same as a tenured professor. (Doc. 15-2 p. 12).

Further, assuming, without deciding, that Tom Collins, Cleophas Gaines, and Dominic Minadeo are similarly-situated comparators for purposes of Scroggins's *prima facie* Title VII claim, the undisputed evidence demonstrates (for the reasons discussed in part III.A.2. of this opinion) that Troy University paid these three comparators more than Scroggins because they had greater academic and professional experience.

Therefore, Scroggins has the burden to provide evidence that the legitimate reason Troy University offered for paying Scroggins less than these three comparators was a mere pretext for an illegal motive. *Mulhall*, 19 F.3d at 597. Scroggins argues that pretext is established by the fact that Troy University once represented to the EEOC that Collins and Minadeo received higher salaries because, in addition to their more extensive academic and employment experience, they lived and worked in different cities than Scroggins. (Doc. 15-1; Doc. 13-39). As Scroggins points out, the record contains evidence that tends to undermine Troy University's representation to the EEOC that a location-based salary differential was partially responsible for the difference between Collins's and Minadeo's salaries on the one hand and Scroggins's salary on the other. (Doc. 15-3 p. 6). However, on

summary judgment, the undisputed evidence establishes that Collins and Minadeo were paid a higher salary than Scroggins because of their more extensive professional and academic experience, which is not related to their respective geographical locations. Accordingly, Scroggins has failed to demonstrate that the legitimate, nondiscrimintory reason offered by Troy (specifically, more extensive academic and professional qualifications) is a mere pretext for paying a lower salary because she is a woman. *Mulhall,* 19 F.3d at 597 ("[T]he plaintiff must then prove that the legitimate reason offered [by the defendant] was a mere pretext for an illegal motive.").

Scroggins also argues that the fact that Collins and Minadeo were paid substantially the same salary despite only one of them holding a Ph.D. demonstrates that Troy University could not have based their salaries on their professional experience and academic backgrounds. As discussed in part III.A.2. of this opinion, both Collins and Minadeo had more extensive professional experience and academic qualifications than Scroggins, a fact that is not negated simply because Collins and Minadeo were paid approximately the same as one another. Scroggins cites no authority for the proposition that Troy University must have exactly the same nondiscriminatory reasons for paying two male professors the same salary, and the court is aware of none.

Scroggins also offers James Orndorff and James Stuckey as similarly-situated male comparators who were lecturers and who held Juris Doctorate degrees. However, it is undisputed that Orndorff and Stuckey were paid less than Scroggins. (Doc. 15-1 p. 3).

Accordingly, there is no genuine dispute of material fact as to Scroggins's Title VII claim that she was paid less than other professors because of her gender, and Troy University is entitled to summary judgment on that claim.

## C.   Title VII Discrimination in Terms and Conditions of Employment

Title VII prohibits employers from discriminating in the terms and conditions of employment on the basis of gender.   42 U.S.C.A. § 2000e–2(a)(1).   In her complaint, Scroggins claims that she was subjected to more strenuous work requirements than male professors because of her gender in violation of Title VII.   Specifically, Scroggins states in her complaint that Troy University "unlawfully discriminated against [her] by requiring her to attend recruitment activities, advise graduate students, maintain office hours and perform office tasks while her male counterparts were not required to do any of these tasks."   (Doc. 1 p. 7).   On summary judgment, Troy University provided undisputed evidence that Collins and Minadeo, the relevant male comparators identified by Scroggins in discovery, were allowed to keep "virtual" office hours, did not keep physical office hours, and were not required to attend school events because they taught online courses and did not live in the same state as their students or the Troy University campuses to which they were assigned. (Doc. 15-2 pp. 22-23).   Scroggins, however, had an office located at Troy University's Elizabethtown, Kentucky campus and, as part of her job requirements at that campus, was required to keep physical office hours, attend recruitment activities, and engage in other tasks which required her physical presence at Troy University functions and faculty meetings.

25

(Doc. 15-27).  Scroggins admitted in her deposition the difference in job requirements was because she had an office at the Troy University campus and lived in Elizabethtown, Kentucky, whereas Collins and Minadeo did not live or work near the Troy University campuses to which they were assigned.  (Doc. 15-2 pp. 22-23).

Accordingly, Collins and Minadeo are not similarly-situated comparators for the purposes of establishing a claim that Scroggins was given additional work because she was a female, and the undisputed evidence supports Troy University's assertion that the difference in job requirements was due to the physical locations of the various lecturers and the feasibility of requiring them to hold physical office hours and attend Troy University meetings and events.  *See Mulhall*, 19 F.3d at 597 (holding that a Title VII plaintiff may prove a Title VII case using "similarly situated comparators" and that, if the defendant establishes a legitimate, nondiscriminatory reason for the alleged discrmination, "the plaintiff must then prove that the legitimate reason offered was a mere pretext for an illegal motive").  Moreover, in her response to Troy University's motion for summary judgment, Scroggins specifically disclaims any assertion that the assignment of "extra" duties constitutes a separate violation of Title VII's prohibition on the terms and conditions of her employment.  (Doc. 15-1 p. 20).

Accordingly, there is no genuine dispute of material fact, and Troy University is entitled to summary judgment on Scroggins's claim that she was subjected to discrimination in violation of Title VII because she was required to perform duties that were not required

of male lecturers.

## D.    Retaliation

By statute, employers are prohibited from retaliating against employees who engage in activity protected under Title VII and the EPA.  *See* 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 215(a)(3).  "Retaliation claims under Title VII and the Equal Pay Act require the same elements." *Ralston v. Bell Aerospace Services, Inc.*, 2010 WL 2403084, 8 (M.D. Ala. 2010) (citing *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)).  A plaintiff establishes a prima facie case of retaliation if she shows (1) that she engaged in statutorily protected expression, (2) she suffered an adverse employment action, (3) there was some causal relation between the two events. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

Scroggins has presented evidence that she engaged in statutorily protected expression[7] when she requested that Troy University address her concerns that she was being paid less than male lecturers because of her gender "in violation of federal law" and the Equal Pay Act.  (Doc. 15-16, Doc. 15-24).  *See* 42 U.S.C. § 2000e-3(a) (prohibiting employers from retaliating against employees who oppose Title VII violations); 29 U.S.C. § 215(a)(3) (prohibiting employers from discharging or discriminating in any manner against any

---

[7]"Even if an employment practice is not as a matter of fact unlawful, a plaintiff can establish a *prima facie* case of Title VII retaliation 'if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. ... A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented.'" *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 857 (11th Cir. 2010) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.1997)).  Troy University has not moved for summary judgment on grounds that Scroggins did not have a subjectively and objectively reasonable basis for complaining of gender discrimination; therefore, the court will not address that issue on summary judgment.

employee who has filed any complaint or instituted proceedings to oppose violations of the Equal Protection Act); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 ("To fall within the scope of the antiretaliation provision [of 29 U.S.C. § 215(a)(3)]," an oral or written "complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.").

In her complaint, Scroggins alleges that Troy University took an adverse employment action against her for her complaints of gender discrimination by forcing her to work in the same office as another employee by whom she felt threatened. *Crawford*, 529 F.3d at 970 (holding that, to establish a *prima facie* case of retaliation, a plaintiff must show that she suffered an adverse employment action). On summary judgment, Scroggins has abandoned her allegation that she was forced to work at the same location as an employee who caused her to feel threatened. (Doc. 15-1, Doc. 15-15). Further, the undisputed evidence on summary judgment demonstrates that Troy University made arrangements for Scroggins to work from home from the time she informed her supervisors that she felt threatened by the employee until the time that the employee took maternity leave. (Doc. 15-5 p. 6). Accordingly, there is no genuine dispute of fact and Troy University is entitled to judgment as a matter of law on Scroggins's claim that Troy University retaliated against her by forcing her to work in a situation where she felt unsafe and threatened by another employee.

Scroggins also alleges that Troy University retaliated against her by refusing to offer

her a position as an adjunct professor after December 19, 2011.  (Doc. 1 ¶ 36).   The uncontradicted evidence establishes that Scroggins was removed from her adjunct teaching responsibilities after she complained to superiors that Troy University had discriminated against her by paying her less than male lecturers.  (Doc. 15-4 pp. 5-8).  Specifically, after Scroggins complained of gender discrimination, Dr. Scott Bailey, acting on behalf of Troy University, decided that Scroggins would no longer serve as a faculty member and assigned her courses to other instructors.  (Doc. 15-20 p. 5; Doc. 15-21; Doc. 15-22).  Troy University argues that the decision not to continue to employ Scroggins as an adjunct cannot constitute a retaliatory employment action because Scroggins had not entered into a contract to teach as an adjunct after December 19, 2011, and, as a nontenured adjunct lecturer, she had no constitutionally-protected interest in continued employment.   However, Scroggins's retaliation claim is not a constitutional or contractual claim, but a statutory one; under well-established precedent, a decision to terminate an employee and a decision not to hire both constitute adverse employment actions for purposes of establishing a *prima facie* case of retaliation under the relevant statutes.  *See Crawford*, 529 F.3d at 970-74.

To establish a *prima facie* case of retaliation, Scroggins must demonstrate that a causal connection exists between her statutorily-protected complaints of gender discrimination and Dr. Bailey's decision to remove her from her duties as an adjunct professor.  *Crawford*, 529 F.3d at 970.  The causal link element of a *prima facie* case of retaliation "merely [requires the plaintiff] to prove that the protected activity and the negative

employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). "'[A] plaintiff satisfies this element if [s]he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse . . . action." *Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1180 (11th Cir. 2003) (quoting *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). Mere temporal proximity, without more, must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). A period as long as one month between a protected activity and an adverse action is not too protracted to infer causation based solely on temporal proximity; however, a three-month interval between the protected activity and the adverse action cannot alone establish causation. *Faircloth v. Herkel Invs., Inc.* 514 Fed. Appx. 848, 852, 2013 WL 1197256, 4 (11th Cir. 2013) (citing *Wideman v. Wal–Mart Stores*, 141 F.3d 1453, 1457 (11th Cir. 1998) (one–month period sufficient); *Thomas v. Cooper Lighting*, 506 F.3d 1361, 1364 (11th Cir. 2007) (three-month period insufficient)).

In this case, Scroggins has presented evidence that less than a month elapsed between Dr. Bailey's awareness of her protected activity and his decision not to hire her, which alone is sufficient evidence to make a *prima facie* showing of causation on the basis of temporal proximity. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (stating that a one-month interval between a decisionmaker's awareness of protected activity and an adverse employment action, standing alone, may be sufficient to establish causation under

Title VII).  In addition, Scroggins has also presented other evidence from which it can reasonably be inferred that he decided not to continue to employ Scroggins as a direct result of that protected activity.

On September 26, 2011, Scroggins sent an email to her supervisor, Dr. Heisler, in which she stated:

> I think I want to resign my position. I sent the email to HR [complaining about a gender-based pay discrepancy] . . . . When I gave specific details, they admitted the pay discrepancy, but shut down any discussion.  If I want recourse, I have to file suit.  I've sent my information to a lawyer in Montgomery for consideration of such an event. . . .

> I have been looking for other job opportunities.  I've received job offers. They aren't great jobs, but they pay more. . . . I am planning on accepting one of these positions in the near future. . . .

> I have invested substantial time with Troy.  I would like to continue to teach as an adjunct faculty member in order to fulfill my time in service to secure my retirement benefits.  I realize that it may be better to resign and be permitted to teach adjunct at this juncture.

> . . . . I hate to ask this of you, but I am seeking your advice here.  I know your loyalty is to Troy.  But I am seeking your guidance on the best way to do this. Can I simply be phased out as full-time and transition to adjunct over the next term or two?  Is this possible?

> I want you to know what is happening with me.  I hope that this will allow you time to come up with some ideas on how to "phase me out." My plans are not definite yet.  I hope that my instincts are correct in seeking your advice.

(Doc. 13-11).

The September 26, 2011 email is "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights

protected by the statute and a call for their protection;" therefore, it constitutes protected activity that "fall[s] within the scope of the antiretaliation provision" of 29 U.S.C. § 215(a)(3). *Kasten*, 131 S. Ct. at 1335.

The record contains evidence that Dr. Bailey became aware of the concerns Scroggins raised in her email within twenty-four hours after she sent the email to Dr. Heisler.  On September 27, 2011, Dr. Heisler replied to Scroggins's email by informing her that he "talked with Scott Bailey today and he indicated that he doubted HR would grant a pay adjustment" to Scroggins.  (Doc. 13-11).  In his deposition, Dr. Bailey indicated that he was aware of Scroggins's September 26, 2011 email to Dr. Heisler, including her intention to resign as a full-time lecturer because of her concern about discriminatory pay and the fact that she had contacted an attorney about her discrimination claims.  (Doc. 15-4 pp. 5, 8). Further, Dr. Bailey stated in his deposition that his support for Scroggins's continued employment at Troy University changed to "non-support" "in September 2011" following, and because of, Scroggins's indication in September 2011 that she wished to resign.  (Doc. 15-4 p. 8).

On October 5, 2011, Scroggins received an email from Kim Barron informing her that she "will be able to continue to teach for [Troy University] in an adjunct faculty capacity." (Doc. 13-49, Doc. 15-6). However, by October 19, 2011, Barron had removed Scroggins from the teaching schedules for terms beginning after December 19, 2011.  (Doc. 15-42, Doc. 15-6).  On October 19, 2011, Dr. Heisler asked Kim Barron why those classes had been

reassigned to "new instructors in place of a seasoned performer," namely Scroggins.  On October 20, 2011, Barron replied: "Dr. Bailey told me he did not want Stacey Scroggins teaching for us after this term.  I have removed her from the term 3 and term 4 schedules." (Doc 15-42).

In her deposition, Barron testified that, when Dr. Bailey instructed her to reassign Scroggins's courses to other instructors, "he said that he felt there could be a conflict of interest, that . . . we need to reassign her classes."  (Doc. 15-6 p. 4).   Although competing inferences may be drawn from this statement, in conjunction with other evidence, a reasonable jury could infer from this statement that Dr. Bailey decided not to hire Scroggins because her legal claims regarding gender discrimination were adverse to Troy University's interests.

Accordingly, the evidence establishes a genuine dispute of material fact as to Scroggins's *prima facie* case of retaliation.  *Crawford*, 529 F.3d at 970 (holding that a *prima facie* case of retaliation may be established by evidence demonstrating that the plaintiff was subjected to an adverse employment action because she engaged in statutorily-protected expression).  Of course, once a plaintiff has established a *prima facie* case, "the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." *Pennington*, 261 F.3d at 1266. "The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff."  *Id.*

On October 24, 2011, Dr. Heisler sent an email Dr. Bailey asking one question: "Speaking of [Scroggins], why are you opposed to her teaching as an adjunct?"  (Doc. 37-37).  Later that day, Dr. Bailey replied:

> I have known [Scroggins] from back when we were both at Ft. Benning.  She is competent, most times, but her bizarre actions and moods make her a higher maintenance asset that I think we need.  I thought her 0-week notice that progressed to a 2-week notice was far from professional.  I don't see the need to reward that.

(Doc. 13-37).

In his deposition, Dr. Bailey stated that, when he referred in his October 24, 2011 email to Scroggins's "bizarre actions and moods," lack of competence, "high[] maintenance" qualities, and lack of professionalism, he was referring not to a pattern of behavior, but to one thing: his impression that Scroggins intended to resign and abandon her classes in the middle of the school term without prior notice.  (Doc. 13-3; Doc. 15-4 p. 2).  Dr. Bailey's testimony suggests that he construed Scroggins's September 26, 2011 email as a "0-week" notice that she had already accepted a full-time position elsewhere and intended to resign effective immediately, although the email clearly does not contain any such indication.  (Doc. 15-4 pp. 5, 8; Doc. 13-11).  By its terms, Scroggins's September 26, 2011 email constitutes advance notice that Scroggins was considering plans that were "not definite yet" to resign as a lecturer at some point in the future and continue to teach at Troy University as an adjunct professor, if possible.  (Doc. 13-11).  Scroggins even indicated her desire to continue to remain at Troy so that she could "fulfill her time in service" and maximize her retirement

34

benefits.  (Doc. 13-11).  The uncontradicted evidence of record established that Dr. Bailey was aware that Scroggins attempted to consult with Troy University to determine a resignation date that would be acceptable to Troy University.  (Doc. 13-11; Doc. 15-4 p. 3; Doc. 15-17; Doc. 15-18).

When Dr. Bailey was asked in his deposition why he nevertheless believed Scroggins provided "a 0-week notice that progressed to a 2-week notice," the reasons he provided were convoluted and unsubstantiated.  On October 10, 2011, Scroggins provided Dr. Heisler with a resignation letter stating that, "[e]ffective at the end of Term 1, 2011, I will be resigning my position as lecturer for Troy University."  (Doc. 15-17; Doc. 15-37).  Term 1 ended on October 18, 2011.  (Doc. 13-31; Doc. 15-4 p. 3).  On October 11, 2011, Dr. Heisler forwarded Dr. Bailey Scroggins's letter of resignation. (Doc. 15-37).  In his deposition, Dr. Bailey explained that it was his understanding that "Troy policy" mandated that employees could not hold full-time jobs elsewhere and teach at Troy. (Doc. 15-4 p. 5).  Dr. Bailey also explained that it was his understanding that Scroggins had "talked to an attorney" who had advised her that she should "start working" someplace else before she tendered her resignation to Troy University.  (Doc. 15-4 p. 5).  Dr. Bailey stated that it was his understanding that Scroggins was "trying to find a job somewhere else." (Doc. 15-4).  At this point, Dr. Bailey's testimony becomes difficult to comprehend, but he indicated that, either because he assumed Scroggins would follow her attorney's advice and begin working at another job before tendering her letter of resignation on October 10, 2011, or because of

some earlier indication that Scroggins was "trying to find" outside employment, Dr. Bailey simply assumed that the policy against outside employment effectively terminated Scroggins's employment. (Doc. 15-4).   This explanation becomes even more mystifying when one considers the fact that the October 10, 2011, notice would have been effective October 18, 2011, which is neither a "0-week" nor a "2-week" notice.

Other evidence likewise calls Dr. Bailey's explanation into serious question, most notably evidence that, on September 30, 2011, Dr. Heisler sent Scroggins an email that stated:

> Scott Bailey has indicated that you should submit your letter of resignation to me and I will forward it to Scott and Dean Edwards.  He also indicated that you are obligated to complete the current term, but if you are employed full time elsewhere, your resignation should be effective at the end of this term.

(Doc. 15-4 p. 3).

Moreover, in his deposition, Dr. Heisler, who oversaw Scroggins's performance evaluations (Doc. 15-52 p. 26), testified that he had never seen Scroggins exhibit bizarre actions and moods.  (Doc. 15-5 p. 10).  Dr. Heisler testified that Scroggins's performance as a lecturer was very good, that she exceeded expectations in teaching, that she was an outstanding teacher, and that she was "an excellent teacher and lecturer." (Doc. 15-5 pp.3-4). Dr. David White testified in his deposition that he had never had any problems with Scroggins while she was at the Fort Benning campus and never noticed any bizarre mood changes or behavior from Scroggins.  (Doc. 15-5 p. 10).  Dr. Bailey himself was supportive of Scroggins's career at Troy University until the time that she indicated that she would look

for other employment if Troy University refused to rectify the perceived gender discrimination by raising her pay.  (Doc. 15-4 p. 8).  A reasonable jury could conclude that the evidence is inconsistent with Dr. Bailey's suggestion that Scroggins was ineffective due to bizarre actions or moods, and that the decision not to hire Scroggins was, in fact, a result of Scroggins's decision to pursue gender discrimination claims.

Dr. Bailey gave one other reason for the decision not to continue to hire Scroggins as an adjunct: that he suspected a "conflict of interest."  (Doc. 15-6 p. 4).  Although competing inferences may be drawn from this statement, in conjunction with other evidence, a reasonable jury could conclude that Dr. Bailey's alleged reasons for deciding not to rehire Scroggins as an adjunct were pretextual, and that Dr. Bailey in fact decided not to rehire Scroggins because of her allegations that Troy University discriminated against her and because of her decision to pursue legal recourse against Troy University.

Accordingly, the court concludes that a genuine dispute of material fact exists as to Scroggins's Title VII and EPA retaliation claim that Troy University decided not to continue to hire her as an adjunct because she complained of gender discrimination.  Therefore, Troy University is not entitled to summary judgment on that claim.

## E.    Breach of Contract

In her complaint, Scroggins alleges that she had reached an agreement with Dr. Heisler and Kim Barron "that she was to be on schedule as an adjunct professor for the academic year August 1, 2011, through term 5 ending July 31, 2012."  (Doc. 1 ¶ 38).

Scroggins alleges that this agreement constituted an employment contract, which was breached when Troy University removed her from the adjunct teaching schedule.

At the outset, the court notes that, although Scroggins lived and worked in Kentucky at the time she entered into the alleged agreement with Troy University, both parties presume, without explanation, that Alabama law governs Scroggins's breach-of-contract claim.  Therefore, the court concludes that any alleged employment agreement was consummated in Alabama[8] and that this fact is so plainly known and undisputed by the parties that they felt no need to discuss it in their briefs.  Accordingly, the court will evaluate Scroggins's breach of contract claim under Alabama law.

Under Alabama law, the requisite elements of a contract include: an offer, an acceptance, consideration, and mutual assent to the terms essential to the formation of a contract.  *Ex parte Grant*, 711 So. 2d 464, 465 (Ala. 1997).  Scroggins has presented evidence that, at the time she resigned her position, she had expressed to Troy University that "she would like to" continue teaching an adjunct for two more years until her retirement benefits vested.  (Doc. 15-6).  Scroggins has even presented evidence that it was her own

----

[8] When exercising jurisdiction over state law claims, this court applies the choice-of-law rules of the forum state, Alabama.  *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998); *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996).  Under Alabama law, "a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction." *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506 (Ala. 1991).  The parties have presented no evidence that a choice-of-law provision governs the alleged contract by which Scroggins was to continue as an adjunct professor through July 31, 2012.

understanding that she would continue to teach as an adjunct until July 31, 2012, and that she tendered her resignation in reliance on her perception that she would continue as an adjunct until that time.  (Doc. 15-2 p. 35; Doc. 15-16).

However, Scroggins has presented no evidence that Troy University itself also understood and agreed that it would continue to employ her as an adjunct until July 31, 2012. At most, the record contains evidence that Troy University represented that she would "be able to continue to teach for us in an adjunct capacity" for an unspecified amount of time. (Doc. 13-49).  In fact, Scroggins did continue teaching as an adjunct faculty member for the term ending December 19, 2011.  (Doc. 13-32).  Under Alabama law, a promise of future employment for an indefinite period of time creates an at-will employment contract, which cannot form the basis of a breach-of-contract action even if the plaintiff has resigned her former position in reliance on the at-will employment contract.  *Aldridge v. DaimlerChrysler Corp.*, 809 So. 2d 785, 793-94 (Ala. 2001); *see also Bates v. Jim Walter Resources, Inc.*, 418 So. 2d 903, 905 (Ala. 1982) ("This Court has consistently held that employment contracts without a fixed term of employment are terminable at the will of either party and may be terminated for good cause, bad cause, or no cause at all.").

In fact, Scroggins's adjunct faculty contract for the term ending December 19, 2011, confirms that Troy University did not make any promise that she would continue to teach as an adjunct from the time she resigned her full-time position until July 31, 2012.  That written

contract, which Scroggins signed on November 1, 2011, states:

> If, in the judgment of University administrators, a sufficient number of students do not enroll in the class(es) covered by the contract to warrant offering this class, said contract shall be null and void.
>
> . . . .
>
> To signify your acceptance of the contract, and your understanding that this contract does not create a right to reemployment in any subsequent term, please sign and return to your Dean, Department Chair, or appropriate designee.

(Doc. 13-32).

The record also includes an adjunct faculty contract that Scroggins signed on September 19, 2011, prior to tendering her official resignation, which contains identical language regarding possible cancellation of the contract and a provision that the contract "does not create a right to reemployment." (Doc. 13-31). Further, when Troy University sent emails to Scroggins inquiring about her availability to teach two online classes as an adjunct professor for the term beginning January 9, 2012 and ending March 11, 2012, those emails specifically stated: "Your availability does not guarantee that eTROY will use you to teach this class. It is used for planning purposes only. If possible, you will be contacted prior to the beginning of the term if employment in this position is cancelled." (Doc. 15-38, 15-39).

Accordingly, Scroggins has not presented evidence from which a reasonable jury could conclude that Troy University assented to an agreement whereby Scroggins would continue to teach as an adjunct until July 31, 2012. *See Ex parte Grant*, 711 So. 2d at 465

(holding that mutual assent is an element essential to the formation of a contract). Further, Scroggins has presented no evidence that Troy University made any promise to her that she would be allowed to continue to teach as an adjunct until July 31, 2012. *See Aldridge*, 809 So. 2d at 793 ("Alabama law is clear that an oral employment contract containing no specifics regarding term, length, or duration of employment is an employment-at-will contract."); *Bates*, 418 So. 2d at 906 (holding that promissory estoppel cannot give rise to an action for breach of an at-will employment contract).

Therefore, there is no genuine dispute of material fact, and Troy University is entitled to judgment as a matter of law on Scroggins's breach-of-contract claim.

## CONCLUSION

Accordingly, it is

**ORDERED** that Troy University's motion for summary judgment (Doc. 12) be and is hereby **GRANTED** in part as to the following claims in Scroggins's complaint, that **JUDGMENT** be and is hereby entered in favor of Troy Universtiy as to the following claims, and that the following claims be and are hereby **DISMISSED** with prejudice:

1. Count I, alleging discriminatory pay in violation of the EPA;

2. Count II, alleging gender discrimination in violation of Title VII;

3. Count III, to the extent that Scroggins alleges that she was subjected to retaliation when she was allegedly required to work in the same office as an

41

employee by whom she felt threatened;

4.      Count IV, alleging breach of contract.  Further, it is

**ORDERED** that, as to Count III of Scroggins's complaint, to the extent that Scroggins alleges that she was subjected to retaliation when Troy University decided not to hire her as an adjunct for any term after December 19, 2011, summary judgment be and is hereby **DENIED**.

Done this 26th day of February, 2014.


                        _____/s/Charles S. Coody_____
                        CHARLES S. COODY
                        UNITED STATES MAGISTRATE JUDGE

42